IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TIFFANY K. RILEY | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. _____ |
| | § | |
| TURTLE & HUGHES, INC. & NEIL FELDMAN, | § | |
| | § | |
| | § | |
| Defendants. | § | |

# COMPLAINT

## 1) NATURE AND STAGE OF THE PROCEEDING

a) Plaintiff, Tiffany K. Riley, brings this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000 et seq., and 42 U.S.C. §1981a. She also brings an action under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §2601 et seq. against Turtle & Hughes, Inc. and Neil Feldman in his individual capacity.

b) Ms. Riley was informed on her first day, November 8, 2010, that those who reported sexual harassment were typically fired. Her ability to do her job as a Black woman was also questioned on her first day. Despite this poor start, Ms. Riley continued to pursue excellence. However, she was subjected to discrimination. And, she was retaliated against after complaining of sexual harassment, racial harassment, and filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). Her raises were not prompt or as promised. In addition, she had to continue to endure lackluster efforts to address ongoing harassment. The EEOC closed her first Charge while she was pursuing leave for her serious health condition and her mother's serious health condition. Within days, specifically, on

September 15, 2014, she and those who helped her with her charge were fired. After filing a second Charge, the EEOC issued a Dismissal and Notice of Rights on June 29, 2016. This lawsuit addresses the injustices Ms. Riley endured.

c) This court has jurisdiction of this action pursuant to 42 U.S.C. §2000e-5, 29 U.S.C. §2617 and 28 U.S.C. §1331.

## 2) PARTIES

a) Ms. Riley is, and was at all times material hereto was, a citizen of the State of Texas, residing in Houston, Texas.

b) Ms. Riley is informed and believes, and upon that basis alleges, the defendant Turtle & Hughes, Inc., is and was at all times material hereto, a New Jersey corporation doing business in Texas at 6611 Supply Row; Houston, Texas 77011.

c) Ms. Riley is informed and believes, and upon that basis alleges, the defendant Neil Feldman is and was at all times material hereto, a Human Resources executive and in-house lawyer working on behalf of Turtle & Hughes doing business in Texas at 6611 Supply Row; Houston, Texas 77011.

## 3) STATEMENT OF FACTS – RACIAL DISCRIMINATION

a) Ms. Riley was hired by Turtle & Hughes to work as a Human Resources Representative.

b) One of the first instances of racial discrimination happened on Ms. Riley's first day. When Kevin Doyle, a member of the management team, came in, he said, "I've heard about Tiffany. Where is she?" After she introduced herself, Mr. Doyle turned his back and said, "Sonny, we need to talk." Mr. Doyle pulled Mr. Sonny Phillips (Ms. Riley's direct manager) aside and asked, "[w]here did you find this little black girl?"

c)  Ms. Riley continued to endure racial discrimination throughout her employment with Turtle & Hughes. She continued to support diversity and push for equal treatment. When it was all over, she was fired and replaced by a Caucasian woman. She was told that the company was not doing well despite being told a month earlier that business was good. She never had a performance review, but was always told she was doing well.

### 4) STATEMENT OF FACTS – SEXUAL HARASSMENT & RETALIATION

a) On Ms. Riley's first day, she received a briefing about the company's history with sexual harassment from Mr. Doyle. According to Mr. Doyle, the company has a practice that when employees allege sexual harassment, Turtle & Hughes goes through a series of layoffs to fire the individuals that complain so they can eliminate the problem.

b) Turtle & Hughes' main offender is Steve Reinhart. On November 30, 2010, Mr. Reinhart sent Ms. Riley a private email asking for dinner. He said, if you want "I will never persue (sic) you in this manner again…I don't trust the Turtle system as far as personal matters go, thus I am writing from my private e-mail." Earlier that day, Steve Reinhart asked her, "[a]re you angry with me." His banter swiveled from flirty to mean. On March 30, 2011, Mr. Reinhart called her an asshole. Ms. Riley was not the only receipient of Mr. Reinhart's abusive treatment. On August 4, 2011, Mr. Reinhart referred to another female colleague as "Leggs" (sic). Because Ms. Riley served in a Human Resources role, she tried to inform Mr. Reinhart on several occasions that his behavior was inappropriate, but when she saw that it persisted, she told upper management.

c) Mr. Reinhart's behavior continued to persist despite numerous requests from Ms. Riley for him to stop. She also continued to inform management of his behavior. Nevertheless, on or around August 19, 2011, Mr. Reinhart invited Ms. Riley to a personal vacation on Jersey Shore. In

addition, he also offered to buy Ms. Riley designer shoes at the Galleria shopping mall.  Again, Ms. Riley refused his requests.

d) On or around August 25, 2011, Mr. Reinhart's girlfriend, Lorrie LNU, told Ms. Riley how Mr. Reinhart met Lorrie at Turtle & Hughes and pursued her.  She also stated that she was worried that Mr. Reinhart would pursue Ms. Riley.

e) The next day, Lorrie LNU showed up and attempted to pick up Mr. Reinhart's personal Employee Stock Option Plan statement.  Ms. Riley contacted Mr. Reinhart to inform him that this too was inappropriate.  She could send this personal information to his house or he could pick it up personally.  She informed Lorrie LNU that she could not accommodate the request.  Lorrie LNU continued to walk around and speak with the staff even though she was asked to leave.  She also accused Ms. Riley of having an affair with Mr. Reinhart.  For the first time, management intervened only to make Lorrie LNU leave the office.

f) However, Mr. Reinhart's behavior continued.  On or around February 21, 2012, Mr. Reinhart told Ms. Riley that she does something to him and he just can't control himself.  He told her she was a beautiful woman.  She again told him that his actions were inappropriate.  His reply was, "ok, but I just wanted you to know that you are such a beautiful woman and sometimes I just forget and lose my senses around you."   Then, he told her he would just leave his phone with her so she could just put her number in it.  He suggested she put her number in the phone and he would save it as "Halle Berry, Jr."  When he came back and she said she had not left her phone number and told him she intended to go to management again, he threatened her by saying, "don't get me in trouble in the business…remember when business is good for me, it is good for the Company which is good for you and your family, right?"

g) On or around February 22, 2012, Ms. Riley informed an outside auditor that he should bring in an outside vendor to provide sexual harassment training because of the various issues between male sales staff who produce financially and the female clerical workers who have to endure sexual harassment. She also informed Kevin Doyle of the need for this training on or around February 23, 2012.[1]

h) On or around March 26, 2012, Mr. Reinhart told Ms. Riley that she and another employee looked like street walkers.

i) According to Ms. Riley's review of employment files, all employees had signed the Harassment policy twice before. However, in August 2012, at the request of management, Ms. Riley distributed the Harassment policy again with a letter from Mr. Phillips asking for employees to review and sign. This was the only step management took at the time regarding the harassment.

j) A year passed without any written harassment until Mr. Reinhart sent an email to the entire office stating happy birthday to the August 2013 birthdays. Specifically, he stated, "[a]ll that I can say is that a lot of sexual activity must take place in Houston during the month of November to have such a long list of ingrates born in the month of August." The email was signed, "[l]aughing, Steven."

k) Around late December 2013, Mr. Reinhart emailed Ms. Riley to ask her whether she would be his private assistant. He offered her $25 an hour to perform personal tasks for him. He also offered to pay for her to commute to his house. This was the last straw for Ms. Riley.

---

[1] Despite this 2012 request, Turtle & Hughes did not provide training until after Ms. Riley filed her first Charge of Discrimination.

l) On or around January 6, 2014, Ms. Riley complained to Mr. Doyle about the sexual harassment by Reinhart.  In addition, Ms. Riley filed a charge of discrimination with the EEOC.  She relayed this information to Neil Feldman, the Director of Human Resources on or around January 28, 2014.  She followed company policy by trying to move her complaints up the chain of command.  However, on or around February 3, 2014, Turtle & Hughes responded through Neil Feldman.  In the letter, it states, "there is no disputing the fact that Steve has issued correspondence to you at several points in time that are inappropriate."  Turtle & Hughes then stated that they intended to address Reinhart's behavior.  They did not terminate Mr. Reinhart.

m) In addition, the letter addressed complaints that due to her race and this sexual harassment, Ms. Riley had not received the raises she was promised at the times she was promised them.  The letter stated that it had given her raises and bonuses, but did not address the fact that she would have made more if the raises and bonuses were timely and at the promised percentages. As Mr. Reinhart is good personal friends with the owners of Turtle & Hughes, it is hard to believe that he or her complaints about him played no part in the denial of Ms. Riley's timely, accurate raise and bonuses.

n) Shortly after, Mr. Reinhart again started harassing female employee, Sharde Hurd. Turtle & Hughes attempted to "train" employees on sexual harassment.  However, instead of getting an outside vendor, the training was created in-house based on the incidents that were the subject of Ms. Riley's Charge of Discrimination.  This was embarrassing for Ms. Riley and contributed to ongoing trauma Ms. Riley experienced from her employment with Turtle & Hughes.

o) In Summer 2014, Ms. Riley received her initial Dismissal and Notice of Rights from the EEOC for her claims of sexual harassment and retaliation.  She was fired shortly thereafter.  She was told that the company was not doing well despite being told a month earlier that business was

good. She never had a performance review, but was always told she was doing well. In addition, several employees who cooperated with the EEOC in support of her Charge were also fired.

## 5) STATEMENT OF FACTS – FAMILY AND MEDICAL LEAVE ACT DISCRIMINATION & RETALIATION

a) In Spring 2011, Ms. Riley informed Mr. Phillips that she was taking care of her mother, who had a serious health condition. Ms. Riley continued to keep Mr. Phillips abreast of the situation with her mother because she needed intermittent leave to give care. Around 2014, Mr. Phillips received questions about Ms. Riley's intentions for filing her Charge of Discrimination from upper management. It is Ms. Riley's understanding that Mr. Phillips informed Mr. Feldman and other members of the management team about her character, including the fact that Ms. Riley's mother had a serious health condition and she had a need for time off to serve as her mother's primary caregiver. She did not receive any FMLA paperwork at that time, but she continued to keep Mr. Phillips and management aware of her leave for her mother's health condition.

b) On or around August 29, 2014, Ms. Riley requested that Family and Medical Leave Act paperwork be sent to her for her own serious health condition. Ms. Riley's paperwork was returned on September 15, 2014. Prior to September 15, 2014, Ms. Riley was in constant communication with upper management to make them aware of her need for leave. Ms. Riley requested leave between September 29, 2014 and October 3, 2014.

c) Ms. Riley was laid off September 15, 2014. She was told that the company was not doing well despite being told a month earlier that business was good. She never had a performance review, but as stated before, she was always told she was doing well. She was replaced and her duties

were assumed by a Caucasian woman, Andrea Nutley. Ms. Nutley is married to an inside salesman at Turtle & Hughes.

### 6) RACIAL DISCRIMINATION IN VIOLATION OF TITLE VII

a) The foregoing paragraphs are realleged and incorporated by reference herein.

b) The Defendant's conduct as alleged at length herein constitutes discrimination based on race in violation of Title VII. The stated reasons for the Defendant's conduct were not the true reasons, but instead were pretext to hide the Defendant's discriminatory animus.

### 7) SEXUAL HARASSMENT AND RETALIATION IN VIOLATION OF TITLE VII

a) The foregoing paragraphs are realleged and incorporated by reference herein.

b) The Defendant's conduct as alleged at length herein constitutes discrimination based on sex in violation of Title VII. The stated reasons for the Defendant's conduct were not the true reasons, but instead were pretext to hide the Defendant's discriminatory animus.

c) The Defendant's conduct as alleged above constitutes retaliation against Ms. Riley because she engaged in activities protected by Title VII. The stated reasons for the Defendant's conduct were not the true reasons, but instead were pretext to hide the Defendant's retaliatory animus.

### 8) DISCRIMINATION & RETALIATION IN VIOLATION OF FMLA

a) The foregoing paragraphs are realleged and incorporated by reference herein.

b) Ms. Riley is informed and believes, and on that basis alleges, that Turtle & Hughes and Neil Feldman qualify as Ms. Riley's "employer(s)" as that term is defined in the FMLA, 29 U.S.C. §2611(4), and that Ms. Riley is an "eligible employee" as that term is defined in the FMLA, 29 U.S.C. §2611(2).

c) Turtle & Hughes and Mr. Feldman willfully violated the FMLA because they knew their conduct was prohibited by the law, or at the very least showed reckless disregard for Ms.

Riley's rights. Ms. Riley was entitled to benefits under the FMLA. Turtle & Hughes and Mr. Feldman illegitimately prevented her from obtaining those benefits. In addition, she invoked her right to her benefits, suffered an adverse employment action, and the decision of Turtle & Hughes and Mr. Feldman were causally connected to her invocation of her rights.

### 9) PRAYER FOR RELIEF

WHEREFORE, Ms. Riley requests that the court award her:

a) the sum of $300,000.00 in compensatory damages suffered because of the discrimination and retaliation;

b) loss of wages and medical expenses, in an amount to be proved at trial, but believed to exceed $25,000 for damages related to her FMLA claims. These costs include, without limitation, lost wages and medical expenses, back pay from the effective date of termination, medical expenses from the date of termination, lost employment benefits from the date of termination. In addition, these costs include future wages and medical expenses as of the date of this complaint;

c) costs and reasonable attorneys' fees incurred with this lawsuit with interest thereon; and,

d) other damages and further relief as deemed just.

### 10) JURY DEMAND

Ms. Riley requests trial by jury.

Respectfully submitted,


By: */s/ Anita J. Barksdale*
    Anita J. Barksdale
    Southern District of Texas No. 964972
    State Bar No. 24049998
    abarksdale@anitabarksdale.com
    Law Office of Anita Barksdale, PLLC
    1980 Post Oak Boulevard, Suite 1500
    Houston, Texas 77056
    (832) 452-7108
    (800) 388-2924 – (facsimile)


**ATTORNEY-IN-CHARGE FOR PLAINTIFF TIFFANY K. RILEY**